1  POMERANTZ LLP
2  Jennifer Pafiti (SBN 282790)
3  1100 Glendon Avenue, 15th Floor
   Los Angeles, California 90024
4  Telephone: (310) 405-7190
   jpafiti@pomlaw.com
5
6  *Counsel for Plaintiff*

7              UNITED STATES DISTRICT COURT
8              CENTRAL DISTRICT OF CALIFORNIA

9

10 | DAVID GRU, Individually and on       | Case No.:
   | Behalf of All Others Similarly Situated,
11 |
12 |                          Plaintiff,   | **CLASS ACTION COMPLAINT
   |                                       | FOR VIOLATIONS OF THE
13 |         vs.                           | FEDERAL SECURITIES LAWS**
14 |
15 | MULLEN AUTOMOTIVE, INC.               | **JURY TRIAL DEMANDED**
   | F/K/A NET ELEMENT, INC., DAVID
16 | MICHERY, and OLEG FIRER,
17 |
   |                          Defendants.
18 |
19

20
21
22
23
24
25
26
27
28

Plaintiff David Gru ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mullen Automotive, Inc. f/k/a Net Element, Inc. ("Mullen" or the "Company"), and information readily obtainable on the Internet.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery

## <u>NATURE OF THE ACTION</u>

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Mullen securities between June 15, 2020 and April 6, 2022, inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## **JURISDICTION AND VENUE**

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

6. Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant Mullen purports to be an electronic vehicle ("EV") manufacturer. On November 5, 2021, Mullen Technologies, Inc. underwent a merger with and into Net

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Element, Inc., and the Company changed its name to Mullen Automotive, Inc. (the "Merger").

8.     Defendant Mullen is incorporated in Delaware with its principal executive offices at 1405 Pioneer Street, Brea, California 92821.  The Company's shares trade on the NASDAQ exchange under the ticker symbol "MULN."  Prior to the Merger, the Company's shares traded under the ticker symbol "NETE."

9.     Defendant David Michery ("Michery") has served as the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of the Company following the Merger.  Prior to the Merger, Defendant Michery served as the CEO of Mullen Technologies, Inc.

10.    Defendant Oleg Firer ("Firer") served as the CEO and Executive Director of the Company prior to the Merger.

11.    Defendants Michery and Firer are sometimes referred to herein as the "Individual Defendants."

12.    The Individual Defendants:

(a)     directly participated in the management of the Company;

(b)    were directly involved in the day-to-day operations of the Company at the highest levels;

(c)    were privy to confidential proprietary information concerning the Company and its business and operations;

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(d)    were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

13.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.    The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## SUBSTANTIVE ALLEGATIONS
## Materially False and Misleading Statements

16.    On June 15, 2020, the Company issued a press release entitled "Net Element Enters into a Letter of Intent to Merge with Electric Vehicle Company Mullen Technologies" (the "Announcement Press Release") which announced the merger between Net Element, Inc. and Mullen Technologies, Inc. and stated the following, in pertinent part, regarding Mullen's ability and timeline to produce and sell automobiles:

> Net Element, Inc. (NASDAQ: NETE) ("Net Element" or the "Company"), a global technology and value-added solutions group that supports electronic payments acceptance in a multi-channel environment including point-of-sale ("POS"), e-commerce and mobile devices, announced today that it has entered into a binding Letter of Intent to merge with privately-held Mullen Technologies, Inc. ("Mullen"), a Southern California-based electric vehicle company in a stock-for-stock reverse merger in which Mullen's stockholders will receive the majority of the outstanding stock in the post-merger Company.

> Founded in 2014, ***Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021 through ICI (Independent Commercial Importers)***. Mullen currently has eight retail locations in California and one in Arizona.

> \* \* \*

> According to Mullen, Mullen also owns several synergistic businesses including: Mullen Auto Sales, a fast-growing series of automobile dealerships and CarHub, a new and unique digital platform that leverages Artificial Intelligence (AI) and offers a complete, easy-to-use solution for buying, selling and owning a car. … The company has 15 patents or patents pending related to its electric vehicles technology, including nine in the United States.

> ***The Dragonfly K50 has been featured at the New York International Auto Show on April 2019***. The car also won the Governor's Choice Award at the 2019 Balboa Bay Club's Classic Auto Show. The K50 has also been the

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

subject of stories in the Wall Street Journal, ABC News, Autoweek, MotorTrend and Forbes, among many other publications. A video of the launch of the car at the New York Auto Show can be seen here. … ***Due to the COVID-19 pandemic, Mullen pushed the targeted date for ICI release of the Dragonfly K50 for 2nd quarter of 2021.***

\* \* \*

According to Mullen, Mullen has created a different business model to enter the EV market with core tenants that include: fast-to-market, highly efficient, ready and proven initial vehicle leveraging an existing vehicle produced internationally and designed to U.S. market needs (development reduced from 4 years to 17 months), and complemented with a portfolio of competitively priced vehicles (three platforms) in the fast-growing Electric SUV segment. According to Mullen, the first SUV Mullen expects to introduce will be the MX-05, a mid-size luxury SUV that will be featured as a battery electric vehicle.

[Image omitted.]

According to Mullen, ***due to launch in Q3-Q4 of 2021, the MX-05 represents Mullen Automotive's entry into the full-electric and range extender, luxury SUV market.*** The MX-05 is expected to fit the Mid-Size SUV segment. ***Mullen projects for pre-launch to have several hundred units produced in 2021 and kickoff into full production in 2022.***

\* \* \*

**About Mullen Technologies:**

Mullen Technologies is a Southern California based ***licensed electric vehicle manufacturer with international distribution*** that operates in various verticals of businesses focusing in the automotive industry; Mullen Automotive, Mullen Energy, Mullen Auto Sales, Mullen Funding Corp., and Carhub. Each of these divisions provide Mullen with diversity of different products and services within the automotive industry. For more information, please visit: www.mullenusa.com.

(Emphasis added.)

17.     The Announcement Press Release quoted Defendant Michery stating the following, in pertinent part, regarding Mullen's ability and timeline to produce and sell automobiles

> "We believe the timing of this merger is ideal for Mullen Technologies," said Mr. Michery. ***"It comes on the preparation of our launch of the Dragonfly K50, which will be available in Q2 of 2021*** and through our retail network in California and Arizona ***and the development of a new EV model, the MX-05 Sport Utility Vehicle, that we expect the start of production next year. ..."***

> (Emphasis added.)

18.     The Announcement Press Release stated the following, in pertinent part, regarding Mullen's dealings with other companies:

> Founded in 2014, ***Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021 through ICI (Independent Commercial Importers)***. Mullen currently has eight retail locations in California and one in Arizona.

> * * *

> ***Mullen is launching this car in conjunction with a cooperation agreement with Qiantu Motor***, a wholly-owned subsidiary of CH-Auto, a leading automotive design and manufacturing company in China.

> (Emphasis added.)

19.     The Announcement Press Release stated the following, in pertinent part, regarding Mullen's battery technology and capabilities:

> In addition, becoming public at this time ***should allow us to accelerate the development of our unique battery technology which is non-flammable, puncture proof, capable of maintaining full capabilities after 500,000 cycles, and is synthetic, requiring no mining of natural resources***.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(Emphasis added.)

20.    The Announcement Press Release quoted Defendant Firer stating the following, in pertinent part, regarding Net Element's due diligence into Mullen:

> "We feel, ***after considering an array of strategic alternatives, that the agreement with Mullen provides our shareholders with the most compelling opportunity***," said Oleg Firer, Net Element's Chairman and Chief Executive Officer. "***We conducted an extensive search of companies that have disruptive technologies, and believe that Mullen represents the best path forward.*** We expect that the merger with Mullen will create a new path forward that should reward our long-time shareholders."

(Emphasis added.)

21.    On December 15, 2020, the Company issued a press release entitled "NETE: Q3 2020 Revenues Improve Despite Continued Shutdowns in NY and California" which stated the following, in pertinent part, regarding its due diligence into Mullen Technologies and Mullen Technologies' ability and timeline to produce and sell automobiles:

**Update on Mullen Technologies Transaction**

***Net Element is still diligently working on completing the transaction with Mullen Technologies. Mullen is still in process of an audit and the S-4 document is being drafted.*** We expect to see it filed by year-end.

Mullen Technologies itself has been progressing on its plans to sell and produce electric vehicles in the US. It started on construction of its pilot manufacturing facility in October and started also taking pre-orders on its $55,000 MX-05 fully electric SUV then. It is repurposing its high voltage battery R&D center as a pilot facility for its line of SUVs. The construction is planned for completion by April 2021 and we have no information that that timeline has changed. ***There the MX-05 SUVs will be assembled to be delivered to customers by the second quarter of 2022.*** The facility is designed to assemble as many as a thousand SUVs annually with other

8

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

models possible later. The company said it plans to hire 100 people to assemble the SUV, the battery, conduct R&D, and provide warehousing. Once completed the plant will build prototypes that will we used to get government approval and certification, a process that should take 16 months. After that, the company could begin deliveries to consumers. ***Customers can also pre-order the imported Dragonfly K50 super sports car from Mullen*** [sic]

**About Mullen Technologies:**

Mullen Technologies is a Southern California-based ***licensed vehicle manufacturer*** that operates in various verticals of the businesses, focusing in the automotive industry: Mullen Automotive, Mullen Energy, Mullen Auto Sales, Mullen Funding Corp. and CarHub. Each of these divisions provide Mullen with diversity of different products and services within the automotive industry. For more information, please visit: www.MullenUSA.com.

(Emphasis added.)

22. On November 15, 2021, the Company issued a press release entitled "Mullen Automotive Announces It Now Owns Tunica, Mississippi, EV Assembly Plant Free and Clear" which stated the following, in pertinent part, regarding Mullen's production ability and timeline:

Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, is pleased to announce today that the company closed purchase of the Tunica, Mississippi, Advanced Manufacturing and Engineering Center (AMEC) without any debt and will begin ramp-up of hiring for the initial set of skilled trades and support staff. AMEC is in Robinsonville, Mississippi, which is located in Tunica County and is approximately 40 miles south of Memphis, Tennessee.

***Mullen's previously announced plans on Nov. 5 to build out another 1.2 million square feet of manufacturing space to support class 1 and class 2 EV cargo vans and the Mullen FIVE EV Crossover at AMEC.*** The facility currently occupies 124,000 square feet of manufacturing space. The total

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

available land on the property is over 100 acres. On the expanded site, Mullen plans to build a body shop, a fully automated paint shop, and a general assembly shop.

Mullen's commitment to the facility is strong and growing with hiring ramp-up now beginning for initial workers to support the initial preproduction build of class 1 and class 2 EV Cargo Vans.

"This is a milestone for Mullen," stated David Michery, CEO and chairman of Mullen Automotive. "We now own this facility free and clear, with no associated debt or financial obligations on the property. AMEC is a tremendous asset for the company, and we are proud to begin hiring and build-out of the Tunica facility."

(Emphasis added.)

23.     On February 28, 2022, the Company issued a press release entitled "EV Manufacturer Mullen Announces Progress on Solid-State Polymer Battery Pack Development" (the "February 2022 Press Release") which stated the following, in pertinent part, regarding its battery technology and capabilities and also its deals with business partners:

Data collected from solid-state cell testing shows impressive results, including a range of 600-plus miles on a full charge and over 300 miles of range delivered in 18 minutes with DC fast charging. Solid-state polymer batteries are slated for the second generation of the Mullen FIVE EV Crossover.

… Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, announces an update on Mullen's next-generation solid-state polymer battery technology, which is a significant advancement over today's current lithium-ion batteries.

***Mullen's testing of solid-state polymer cells reveals the potential for a 150-kilowatt-hour battery pack that delivers over 600-plus miles of range and highlights an 18-minute DC fast charge which can yield over 300***

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

***miles of range.*** Mullen is working towards utilizing solid-state polymer battery packs in its second generation Mullen FIVE EV Crossovers, with in-vehicle prototype testing set for 2025. Mullen's first-generation FIVE EV Crossover, due in late 2024, is planned to launch with traditional lithium-ion cell chemistry.

***Mullen is also conducting extensive research and development into other advanced battery technologies, including lithium-sulfur and lithium-iron-phosphate.*** Mullen's ultimate goal is to deliver EV batteries that will surpass today's existing lithium-Ion technology and offer a host of benefits such as increased efficiency, energy density, and range while also lowering the cost, weight, thermal and environmental risks.

* * *

***Mullen has recently announced a string of key partnerships with hofer powertrain, Comau, ARRK, Dürr, and DSA Systems for EV powertrain, engineering, manufacturing, vehicle production systems, and over-the-air (OTA) and vehicle system diagnostics***, respectively. The Company expects these strategic developments to play a crucial role in bringing the FIVE to market with the latest technology and in the shortest amount of time.

(Emphasis added.)

24.     The February 2022 Press Release quoted Defendant Michery stating the following regarding the Company's battery technology and capabilities:

"We've conducted successful testing and will begin pack level development next," said David Michery, CEO and chairman of Mullen Automotive. "***The test data collected shows an impressive outcome and future for solid-state batteries***. To sum up, we tested our 300 Ah (ampere-hour) cell which yielded 343 Ah at 4.3 volts, and ***the results surpassed all expectations. We can say with almost certainty that this technology, once implemented on the Mullen FIVE, will deliver over 600 miles of range on a full charge.*** The future is bright for Mullen Automotive."

(Emphasis added.)

25.     On March 17, 2022, the Company tweeted the following, touting its battery technology and capabilities:

> #MullenAutomotive featured on Yahoo Finance Live! ☑ **$MULN was identified as a standout that is doing well among falling #EV stocks due to its solid-state battery technology** and strong domestic presence. #ElectricCars #MullenFIVE #GreenTechnology

> [Image omitted.]

> (Emphasis added.)

26.     The statements referenced in ¶¶16-25 above, made by or attributed to Defendants, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Mullen overstates its ability and timeline regarding production; (2) Mullen overstates its deals with business partners, including Qiantu; (3) Mullen overstates its battery technology and capabilities; (4) Mullen overstates its ability to sell its branded products; (5) Net Element did not conduct proper due diligence into Mullen Technologies; (6) the Dragonfly K50 was not (solely) delayed due to the COVID-19 pandemic; and (7) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## **The Truth Emerges**

27.    On April 6, 2022, during trading hours, market analyst Hindenburg Research released a report regarding the Company entitled "Mullen Automotive: Yet Another Fast Talking EV Hustle" which detailed several alleged issues with the Company (the "Hindenburg Report").

28.    The Hindenburg Report stated the following, in pertinent part, regarding Mullen's production ability and timeline:

- Mullen is an aspiring EV manufacturer that came public in late 2021 via reverse merger. It has yet to produce a sellable vehicle. …
- Recently, Mullen shocked the market by claiming it would begin manufacturing 2 models of electric vans within months for an unnamed "major, major Fortune 500 customer". The news sent its stock up ~35% intraday.
- The 2 electric cargo vans that Mullen claims it will be manufacturing are actually Chinese EVs rebranded with a Mullen logo. Import records show the company recently imported 2 vehicles from China, one of each model.

\* \* \*

**Mullen's Vehicle Offering #3: The Mullen FIVE, a Compact SUV The Company Aspires to Develop, Manufacture and Deliver by The End of 2024**

The Mullen FIVE is pitched on the company's website as a "premium compact sport utility electric vehicle" that was "born out of [Mullen's] love" for California. The company says it is "designed, engineered, and manufactured entirely in the USA".

[Image omitted.]

In 2021, Mullen reported only $3 million in R&D expenditures, which consisted "primarily" of Mullen FIVE EV show car development by "employees and consultants".

---

13

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

We estimate that the company would likely need billions in capital to launch the FIVE, given that Mullen proposes to essentially build the vehicle and retool/build a manufacturing facility from the ground up in order to mass-produce the vehicle.

The company has barely made any progress toward this massive goal, acknowledging in its recent annual report that it is still negotiating with various manufacturing integration companies to assist in all aspects of design and development of a facility.

Nonetheless, Mullen said it hopes to complete its manufacturing facility by Q1 of 2024, and have a sellable Mullen FIVE 9 months later, by the 4th quarter of 2024.

\* \* \*

**Location #4 - Tunica, MS (November 2021)**

**The Plant Was Previously Tooled to Build a Pizza Delivery Car, But Its Prior Owners Never Managed to Sell a Single Vehicle**

**Mullen Originally Said The 134,700 sq/ft Facility Would Serve as A Pilot Plant. But With Its Memphis Plans Abandoned, Mullen Claims It Intends to Expand the Plant by an Additional 1.2 Million sq/ft, With No Details On Bow This Will Even Be Physically Possible**

\* \* \*

According to the Mississippi State Auditor, Greentech's electric car plant closed "before it ever produced a car quoted the state auditor as saying." An article quoted the state auditor as saying:

"On the day when they cranked up those energy-efficient electric cars and blue smoke bellowed out, you knew that this was a sham from the very beginning."

\* \* \*

Other media reports, citing federal documents, said Greentech may have produced a total of 25 vehicles at the Tunica plant, but not a single one was reportedly sold.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**Mullen Claims Its Former Pizza Car Manufacturing Facility in Mississippi Is Stocked with State-of-the-Art Equipment and Machinery**

**But Pictures and Video of the Facility Show It Has Limited Equipment**

***The Company's Website Features One Photo of Advanced Manufacturing Equipment. We Found That It Was a Stock Photo***

Mullen Automotive calls the Tunica, Mississippi facility Its Advanced Manufacturing Engineering center (AMEC). The company states that "AMEC is fully tooled with state-of-the-art equipment and machinery."

Given Greentech's limited history of production, it is not clear how much assembly line equipment was ever installed nor how much was in place when the Tunica plant was shuttered.

However, a 2017 review by the Mississippi State Auditor mentioned assembly equipment and car parts offered as loan collateral by Greentech amounting to only $3.4 million. It is not clear if that was the total value of assembly equipment at the factory when Greentech went bankrupt.

Mullen's website has a brief video that shows the interior of the factory. It looks to have storage space, tables and chairs for employees, and several lifting cranes. It does not appear from the video that there are any assembly lines, or robotic manufacturing machines.

[Image omitted.]

However, Mullen's website does feature one picture that shows advanced manufacturing robots. An online search shows that it's a stock photo, which appears to have been purchased from Adobe stock images.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS



*Source: Mullen's website* (http://www.mullenusa.com/manufacturing)



*(Source: Adobe Stock Photos* (https://stock.adobe.com/494146009))

(Emphasis added.)

29.     The Hindenburg Report stated the following, in pertinent part, regarding Mullen's dealings with Qiantu:

- In 2019, the Mullen Dragon Fly was revealed as a supercar built by Chinese manufacturer Qiantu Motors and was meant to be rebranded and sold by Mullen starting in 2020. ***Following the reveal, Mullen***

*immediately defaulted on its payment obligations to Qiantu, leading to termination of the agreement in October 2019.*

- Mullen continued to market the vehicle as its own. In legal documents, Qiantu alleges this is "an inexcusable misuse of Qiantu's own intellectual property". Despite the termination of the agreement, Mullen to this day still says the Dragon Fly is "Coming Soon" on its website and is soliciting $1,000 reservations for the vehicle.

- For its other proposed vehicle, an electric SUV, Mullen previously announced it received an order for 10,000 vehicles, representing $500 million in potential revenue. We called the South Florida contractor firm that placed the order. It currently has only around 11 vehicles, none of which are electric.

(Emphasis added.)

30.    The Hindenburg Report stated the following, in pertinent part, regarding Mullen's battery technology and capabilities:

- The company's stock has spiked ~316% in the past couple of months driven by retail investor euphoria over bold claims of ground-breaking technology, near term production of its EV vans, and a major as-yet-unnamed Fortune 500 customer.

- Despite only spending ~$3 million in R&D in 2021, Mullen claims its solid-state battery technology is on track for commercialization in 18 to 24 months, putting it head of every major technology and automaker in the industry who have collectively invested billions on solving the problem.

- Mullen recently press released an update on its battery testing, sending its stock soaring 145% in a day. In reality, the "news" appears to be a rehash of testing the company had already announced in 2020.

- Mullen apparently misrepresented the test results, according to the CEO of the company that performed the tests. Its CEO told us of Mullen's press release: "We never would have said that. We never did say it and certainly wouldn't have said it based on the results of testing that battery.

* * *

With only $360 (numbers *not* in thousands) in unrestricted cash as of December 31st, 2021, nearly $19 million in near-term debt, $48.4 million in current liabilities and consistent operating losses, the company seemed to be teetering on insolvency right out of the gate.

Then, on February 28th, 2022 the company made a surprising announcement. Despite spending only $3 million in R&D during its entire fiscal 2021, Mullen claimed it had made progress and "significant advancement'" on development of solid-state batteries, a widely regarded "holy grail" of the EV battery industry that has long-eluded tech and automaker giants such as Panasonic and Volkswagen. The stock rallied ~145% on the day.

* * *

**Part I: Mullen's Bold Claims of Being on the Cusp of Revolutionizing the Solid-State Battery Market**

**Mullen's Claims About Its Solid-State Battery Development Would Put It Ahead of Every Major Automaker, Which Have Collectively Invested Billions into The Technology**

The auto industry is collectively investing billions into developing solid-state battery technology. Given Mullen's tiny 2021 R&D budget of $3 million, which it acknowledged mainly went toward building show cars, we found its claims to have ground-breaking solid-state battery tech to be exceedingly implausible.

In a January 28th, 2022, interview, Michery claimed Mullen was on track to commercialize solid-state polymer batteries in the next 18 to 24 months, putting it well ahead of every other major automaker working on this critical industry issue.

By comparison, solid-state technology developer Quantumscape has a cumulative $1.2 billion in order to develop solid-state battery technology, with $300 million coming from Volkswagen. The company said it aims to commercialize production in 2024-2025.

Other major auto companies have later targets. Toyota has thousands of patents in the solid-state battery field with its partner Panasonic, and aims

for deployment in 2025. Mercedes aim to introduce their solid-state technology by 2027 and 2026 respectively, while Nissan and BMW aim to produce it by 2028 and 2030, respectively. Other major automakers like GM, Ford and Hyundai have all announced major investments or partnerships in solid-state technology without clear timelines for production.

\* \* \*

**Mullen's Battery Claims Were Based on Technology Licensed from A Newly Formed Chinese Battery Technology Company Called Linghang Boao**

***Mullen Made Only One $390,000 Payment Under Its Licensing Deal. It Then Announced the Importance of the Relationship Around Its Go-Public Merger, Then Promptly Then Terminated the Deal***

**Lingbang Boao's Websites No Longer Work**

In November 2019, Mullen entered into a three-year Strategic Cooperation Agreement ("SCA") with Linghang Boao Group Ltd to co-develop a solid-state battery management system with a 480-720-mile driving range.

The Company's total financial commitment under the agreement was $2,196,000. On December 3, 2019, the Company paid the first installment of $390,000. It would be the only payment made in the agreement.

Linghang Boao was registered in China in November 2018, just one year before its agreement with Mullen, according to Chinese corporate records. It shares a cell phone number with at least 99 other companies and listed its address inside a high-rise building (not a factory).

Its U.S. website just 9 months prior to its agreement with Mullen, no longer works. Nor does its Chinese website. An online slide deck about the company, uploaded 2 years ago, claims it "has been continuously breaking through in the field of power and energy storage batteries".

Nonetheless, the agreement with Linghang Boao seemed to serve as the foundation for Mullen's bold battery claims. During its announced go-public merger on June 15 2020 Mullen said:

"... becoming public at this time should allow us to accelerate the development of our unique battery technology which is non-flammable, puncture proof, capable of maintaining full capabilities after 500,000 cycles, and is synthetic, requiring no mining of natural resources."

Just months later, around September 2020, Mullen terminated the relationship, claiming that COVID was a force majeure event.

**Our Overall Take: Mullen's Battery Tech Claims Are Smoke And Mirrors**

***We think Mullen has severely and repeatedly misled investors on its claimed battery technology***. Its latest iteration of its battery story is an agreement with Nextech Batteries, a small Nevada-based R&D firm with about 17 employees on LinkedIn.

We spoke with Nextech's CEO, Bill Burger, and found him to be straightforward about the stage of his technology. He explained that while they are optimistic, they are presently in the prototype and R&D phase, and aiming to secure financing in order to build out a manufacturing facility, continue testing, and move toward higher volume.

***We suspect that Mullen is once again attempting to borrow credibility from others in order to make grandiose claims to investors, pitching aggressive short-term timelines that bear little resemblance to reality.***

(Emphasis added.)

31.    The Hindenburg Report stated the following, in pertinent part, regarding Mullen's ability to sell its branded products:

- Mullen has other major production hurdles. The company has no EPA certificates for its vans (nor any vehicle), a requirement to sell vehicles in the U.S. that often takes 12-18 months. It has only a handful of job openings for its plant, and hasn't begun significant hiring, according to the President of the Tunica County Chamber of Commerce. …
- Mullen's plant in Tunica Mississippi was previously tooled to build a pizza delivery car, but prior owners never managed to sell a single vehicle.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

- Mullen originally said the 124,700 sq/ft facility would serve as a pilot plant, but after abandoning several other plant projects, Mullen now claims it intends to expand the plant 1 Ox, or an additional 1.2 million sq/ft, with no details on how this will even be physically possible.
- ***Mullen claims its former pizza car manufacturing facility in Mississippi is stocked with state-of-the-art equipment and machinery, but photos and video of the facility show it has limited equipment.***
- ***Mullen's website features one photo of advanced manufacturing equipment. we found that it was a stock photo which appears to have been purchased from Adobe stock images.***

\* \* \*

***Despite having a limited staff of just 44 full-time employees as of 2021 fiscal year-end, Mullen announced that it would imminently begin manufacturing electric vans for an unnamed Fortune 500 customer.*** The prospect of near-term revenue and a major, credible customer resulted in an immediate 35% intraday stock spike.

\* \* \*

**The Reality On The Ground Seems to Starkly Differ From Mullen's Claims of Imminent Production**

***The Company Has No EPA Certificates for Its Vans (Nor Any Vehicle), A Requirement to Sell Vehicles in The U.S. That Often Takes 12-18 Months***

**Furthermore, Mullen Hasn't Begun Significant Hiring for Its Plant, According to The President of The Tunica County Chamber of Commerce**

Even if Mullen *does* choose to surreptitiously import and/or assemble and rebrand Chinese vehicles, additional hurdles prevent its claimed near-term U.S. customer deliveries.

***According to the EPA website neither Mullen, Tenglong nor DFSK have certificates required to sell vehicles in the U.S. We also checked with the EPA press office who wrote us they had received no certificate applications for any Mullen vehicles.***

***The EPA makes it clear these certificates are compulsory:***

21
CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

"A Certificate of Conformity is the document that EPA issues to a vehicle manufacturer to certify that a vehicle class conforms to EPA requirements. Every class of motor vehicle introduced into commerce in the United States mug have a Certificate of Conformity. Certificates are valid for only one model year of production."

We consulted an Independent Commercial Importer (ICI), one of 6 entities that have obtained official EPA credentials to legally import vehicles into the United States, about how long it could take Mullen to obtain certificates of conformity for Chinese passenger vehicles and light vans. A representative for the ICI told us:

"Cost and time to be determined - after inspection average 12 to 18 months."

According to experts we consulted, in order to qualify, vehicles must go through crash testing and inspections. Vehicles sold in Europe or China must often be reworked to suit the safety requirements of the U.S. market, such as adding airbags, changing belts, and modifying wheels and other components. …

All vehicles sold in the U.S. must also comply with Federal Motor Vehicle Safety Standards (FMVSS) testing required by the NHTSA. Mullen has yet to disclose whether its vans have begun this process, let alone satisfied these criteria.

\* \* \*

***Given that Mullen has no apparent EPA certificates, no apparent FMVSS testing and no apparent adequately staffed factory, we estimate that the company is years away from ever delivering a vehicle should it actually take genuine steps to do so.***

\* \* \*

**Mullen's Vehicle Offering #2: The Mullen "DragonFly"**

**2019: The Mullen DragonFly Was Revealed as A Supercar Built by Chinese Manufacturer Qiantu Motors, Meant to Be Rebranded and Sold Through Mullen Starting in 2020**

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Another of Mullen's key prospective product offerings is the DragonFly, a luxury sedan supercar manufactured by Qiantu out of China.

The vehicle, known as the Qiantu K50, was introduced in China in 2015. In December 2018, Mullen and Qiantu announced a cooperation agreement to "homologate and assemble cars in the us for sales in North America."

Mullen put its logo on the car and revealed it as the rebranded "DragonFly" to the U.S. market in April 2019 at the New York International Auto Show. …

**Following the Reveal, Mullen Immediately Defaulted on its Payment Obligations to Qiantu, Leading to Termination of the Agreement in November 2019**

**Yet Mullen Continued to Market the Vehicle as Its Own. In Legal Documents Qiantu Alleges This is "An Inexcusable Misuse of Qiantu's Own Intellectual Property"**

**Behind the scenes, the partnership quickly went south. Subsequent litigation records reveal that Mullen immediately defaulted on its obligations, missing its first payment to Qiantu to cover pre-launch costs.**

With an outstanding balance owed by Mullen to Qiantu of almost $23 million, Qiantu terminated the agreement in November 2019. It also expressed surprise in its earlier Notice of Termination to Mullen that "Mullen could so badly miss the mark immediately out of the gate."

[Image omitted.]

Rather than acknowledge the end of the deal. Mullen continued to market the partnership as if it were ongoing, Qiantu alleged in legal documents. It even continued soliciting reservations for the vehicle, calling it the "Mullen K50" on social media posts.

* * *

**Despite the Termination of The Agreement with Qiantu, Mullen Continued to Market the Offering, Including During Its Go-Public Period**

**To This Day, It Still Says the DragonFly Is "Coming Soon" On Its Website and Is Soliciting $1,000 Reservations for the Vehicle**

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Despite the termination of the agreement and the ongoing dispute, the Dragon Fly has been continuously marketed by Mullen as an ongoing offering.

On June 15, 2020, 7 months after the Qiantu agreement had been terminated and had devolved into litigation, the press release announcing Mullen's go-public merger said:

"Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021"

Chairman/CEO Michery was then quoted as saying:

"[The merger] comes on the preparation of our launch of the Dragonfly K50, which will be available in Q2 of 2021."

***To this day, the DragonFly is featured on Mullen's website, which is currently soliciting reservations with a $1,000 deposit.***

[Image omitted.]

Other parts of the Mullen website claim the DragonFly Is "coming soon".

[Image omitted.]

In its most recent annual report, Mullen claimed to be pursuing the purchase of intellectual property rights relating to the K-50. Should it succeed, it would presumably need to figure out a way to actually manufacture the vehicle, a process we expect would not be "coming soon".

***Chinese Media Reports That Qiantu Ran into Financial Trouble Around 2020 And Halted Production of the K50***

A closer look at the timing and subsequent collapse of the Qiantu-Mullen deal reveals a Chinese company that lacked finances to build the vehicle negotiating with an American company that didn't have the cash to buy it.

(Emphasis added.)

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

32.     On this news, Mullen's stock price fell $0.27 per share, or 10%, to close at $2.38 per share on April 7, 2022, on unusually heavy trading volume, damaging investors.

33.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

34.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Mullen during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether Defendants' acts as alleged violated the federal securities laws;

(b)   whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)   whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(d)    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

40.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

41.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

42.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

47.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

48.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

49.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of the

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

50. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

51. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

52. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

53.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

55.     As officers of the Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

56.     Because of their positions of control and authority as senior officers, Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period.  Throughout the Class Period, Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

57.    The Individual Defendants, therefore, acted as controlling persons of the Company.  By reason of their senior management positions, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.   The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

58.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

<div align="center">

**<u>DEMAND FOR TRIAL BY JURY</u>**

</div>

Plaintiff hereby demands a trial by jury.

Dated: May 12, 2022

<div style="margin-left: 40%">

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone:   (310) 405-7190
jpafiti@pomlaw.com

***Attorney for Plaintiff***

</div>

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS